Good morning. May it please the court, my name is Peter Wolfe. I represent Mr. Paik in this appeal. I'm the federal public defender, not that that matters, but we picked this case up on appeal and so I think actually, I don't know if it's a benefit, neither trial counsel are here arguing today. I guess I would start by observing that we have a number of issues here based on sufficiency of the evidence and so I would end on plain error. And it turns out that under Ninth Circuit law, the difference between reviewing a case for sufficiency of the evidence under plain error or as preserved error isn't really very different at all. And this court said in the Flyer case, explain why plain error review of the sufficiency of the evidence claim is only theoretically more stringent and the reason for that is that when a conviction is predicated on insufficient evidence, the last two prongs of the plain error review will necessarily be satisfied. In other words, when a person is convicted on insufficient evidence, almost by definition that affects the defendant's substantial rights and seriously affects the fairness, integrity, or public reputation of the judicial proceeding. Well, we're here in a law school and so we might go a little bit outside of what we might ordinarily talk about. When we're looking at sufficiency or insufficiency of the evidence, how do we take a look at that? From what standpoint? Do I have any presumption? Yeah, the presumption, well you're supposed to look at it from the standpoint of upholding the verdict and giving the government, in this case, the benefit of all fair inferences that arise from the evidence. So we take a look at the evidence in the light most favorable to the prosecution. That gives you a high hill to climb, doesn't it? It does, but I think we're going to be able to climb it today, at least I'm hopeful. So I think maybe I'll turn to the 208 claim first. That's the count nine. The defendant was convicted of what this court has called, or at least has been called, a felony conflict of interest. But I think that the important thing about the conviction on count nine, and the insufficiency of the evidence with respect to count nine, is something that seems to have been overlooked really in the trial court, maybe by everybody, which is that the critical inquiry is what was the defendant doing on behalf of the government? He was working on behalf of the government, and then he was also working with his partner. He got knowledge from his work with the government, imparted that to his partner and to Ducks Unlimited, and then bid, made a bid, knowing that the other bids were higher. How is that, and that was in his own self-interest, how is that not a conflict of interest? It may well be a conflict of interest in the general sense of the term, and it would certainly, it strikes me, amount to some sort of appearance of impropriety. But that's not what 208 is addressed to. 208 requires for there to be a violation that the defendant who has the conflict do something as a government officer or employee through decision, approval, disapproval, or recommendation, rendering advice, investigation, or otherwise in a contract. And so the way to, I think, contrast this case with the Ninth Circuit's leading case on this point, which is the Selby case, is just to compare the facts. Ms. Selby, the official Ms. Selby of the Bonneville Power Administration, was actively involved in recommending to the Bonneville Power Administration and to other people who were carrying out this function that certain software should be purchased by the BPA. And the conflict she had was that her husband worked for the software vendor that was going to fulfill the contract. Here, by contrast, the testimony is pretty clear that Pike had nothing to do as a government employee with that contract between Ducks Unlimited and Kauai Fire Protection. So in other words, the things he did do, which is the things Your Honor, he was the main person on the refugee project, wasn't he? No, he wasn't. He was an employee. He was the equipment operator. It's my understanding from the record that he was the main person on the refuge overseeing the contract. I think that's not true. The overseeing of the contract between Ducks Unlimited and Kauai Fire Protection was Ducks Unlimited. Let's go back a second to basics. Your client, Pike, was an employee of the Fish and Wildlife Service, am I right? That's true. And so he was an employee of the United States government. That's right. And he acknowledges signing a certificate that says, as an employee of the United States government, I will not do one, two, and three conflicts of interest, participate financially, and all that stuff. He's bound by that, right? He's bound by that, but that's not Section 4. Could he have stepped forward, given those circumstances, and said to DU, I personally want a contract with you for this job, and I want you to pay me? Could he have done that? He could have done it if... He would have been thrown out the window. Well, he could have done it if he disclosed to Fish and Wildlife. The point is, he didn't, and he concocted, along with Duarte, a whole bunch of straw... KFP had nothing to do with this. It was a pass-through. They created a straw man contractor, and the like most favorable to the government shows that this was entirely done in order to deceive DU and the government of who was actually being involved, which was Pike, who couldn't participate in this kind of a contract, by virtue of law and his signed certificate. And so, for purposes of this argument, I grant that all that's true. That doesn't make out a 208 violation, because the 208 violation... It doesn't, and he was sharing money that was coming from the federal government as a result of participating in something which you just conceded he couldn't participate in. Well, but he couldn't participate because of the executive order that had to do with what executive branch employees can and cannot do. That doesn't make out the 208 violation. 208, as this court has said, requires participation on behalf of the government in a matter in which the employee has an outside financial interest. Yeah, you see, but he was wearing two hats, and that was the problem. He had disguised himself. He was stuck with being an employee of the government, and he disguised himself through this series of straw transactions as somebody else. So it's the same as if it was Pike himself.  Well, I think that's not true, and the reason it's not true is because of the distinction between what happened in Selby, which is this court's decision, and what happened here. In Selby, he had decisions that were made by the BPA about what software to buy. Here, Ducks Unlimited made no decision about contracting with KFP based on anything Pike said. That was the testimony of Palmer, and Hawks, the regional manager...  When you look at the computers, and what was found in Pike's computer, and also we have to remember here that the judge made a finding that your client's claims during trial that he didn't know where anything was, or didn't do this, was all perjury. The judge found that your client's testimony was perjury, so we take all of this in the light most favorable to the government, and it's clear that your client is the one who was actually drawing up the contracts. Yeah, but that's... I guess I'm not making my point clear. If Pike had told Hawks... Oh, you're making your point clear, I'm just not necessarily agreeing with it. That's clear. If Pike had some role in either the Fish and Wildlife Service decision to enter into the contract with Ducks Unlimited, or some role in how the Fish and Wildlife Service dealt with the Ducks Unlimited contract, he might well be guilty, but that's not true. So what about his role in underbidding everybody else, including suspiciously by $1,000 on the Kobayashi aspect of it? I mean, he seems to have been the one who was filling in the numbers. According to what Duarte said, the guy pulling all the strings was your client. But that doesn't mean... But he had no role in the decision about who they would contract. His role was deceiving everybody. Well, that doesn't make it out of two... Because the two-way violation is dependent upon... It's designed to protect not against conflicts of interest or financial conflicts of interest. It's designed to protect the integrity of the advice that the government employee gives to the government. And if the government employee doesn't give any advice to the government about the contract, then he's not guilty of this. He might be guilty of something else. He might be in violation of the executive order, but he's not guilty of 208. That's the point, I think. And did you... I guess you were at the trial council. Was there any objection to the criminal conflict of interest instruction? No, and that's the other problem with the 208, is that the instruction expanded the indictment, the scope of the indictment, because the indictment didn't include two of the possible... or two of the statutory terms in terms of how you violate the thing. So you're on the constructive amendment claim now? Right. The problem with that, again, is that, again, we're in a law school setting. The standard of review changes dramatically based on whether an objection was made at the trial. And there was no objection at the trial. You're right. And the problem is your brief says it's a de novo review. It says it's plain air, but the brief that's filed says it's a de novo review, and the standard review, again, is very important. So this is plain air. It has to be air, it has to be plain air, and it has to substantially affect it, and then the fourth prong and all that. Right. So I don't think there's too much doubt that it's plain air. The question is really prongs two and three. And the problem with the way the instruction came down is twofold. Number one, it expanded by adding the terms disapproval or investigation, and it also expanded the definition of what was involved in terms of the entities involved, because the government's indictment and the grand jury transcript and the entire theory at trial is that the problem here had to do with the Ducks Unlimited Kauai fire protection contract and Pike's interest in that contract. But then in the instructions, the court expanded it so it could include any entity, and the any entity definition, as expanded, might have opened up conviction of Mr. Pike, either because he had his interest in the Anini Landscaping Company, which had rented one of the machines to work there, or the jury could have thought that any entity included the Fish and Wildlife Service itself, and that was way beyond what the government's theory was and how it was presented. So that's why we think that was a significant error. Let me ask you, you don't deny that Pike knew that Ducks Unlimited would be submitting deceptive KFP invoices to the government for the reimbursement. But they didn't submit the invoices. They submitted their invoice, which took the amount straight off the KFP invoice, and put it on a line that said, you know, vendor for earth moving or something like that. They didn't actually take the KFP invoice and pass it on to the government. You're saying it wasn't deceptive? No, I'm not saying that there was, that Pike didn't conceal his involvement. What I thought your question was, do I acknowledge that Ducks Unlimited would pass on to the government, the Fish and Wildlife, a copy, is how I understood it, of the KFP invoice, and that actually didn't happen. They took the amount and put it on an invoice with some other things and sent that to Isn't that a difference without any distinction at all? Well, I don't know. I think it does make a difference. Who owned this refuge, this area that we're talking about that's being fixed up? Well, the Fish and Wildlife. The government, the United States government? Yes. Pike worked there? True. So he knew that it was a government property? I think he must have known that. So he also knew that the government was eventually paying for this, not DU. DU wasn't doing this as a charitable contribution to the government, was it? Right. So Pike knew that at the end of the line, it was the government's money that was being involved? Yeah, I think that would have to be pretty obvious, but the money that KFP got was not the government's money. Because KFP was paid by Ducks Unlimited before the Ducks Unlimited billed the government and before the government paid Ducks Unlimited. So KFP was paid out of Ducks Unlimited's funds, and then Ducks Unlimited submitted a claim for reimbursement, which included the KFP bill plus 10% for their trouble being the contractor and some other expenses because the contractor included other things, and they submitted that to the government. Did you want to reserve the rest of your time for me? Yeah, I'd better. Okay. May it please the Court, Your Honor. Larry Tong, appearing for the United States as a matter of interest. Since he introduced himself, I'm an assistant United States attorney. I, too, was not the trial attorney on this case, but picked up the appeal, as did Mr. Wolf. It's a pleasure to see you again today. I'd like to start by following up on Judge Trott's summary of the case. I think, Your Honor, you've captured the essence of the case. The whole point of the conduct of Mr. Pike was to deceive the government, not to deceive Ducks Unlimited, except as was necessary to deceive the government. He was a government employee, worked for Fish and Wildlife Service on this refuge on Kauai, and he was the primary person representing the government with regard to this contract. It is true that he was not a high-level decision-maker who ultimately would decide who would get the contract. It is true he did not negotiate the precise terms of payment or even sign the contract. But what is equally true is that this was a small refuge. He was the go-to person de facto on behalf of the government. He was the only person there, really, that was there full-time, available both on behalf of the government and to Ducks Unlimited, the government's contractor. And as a result of that, he served as a jack-of-all-trades, as is reflected in the evidence. So was he overseeing the contractor? He was overseeing the daily affairs of the contract. He may not have been saying, Look, after it has worked through seven layers of approval, I will finally make a decision. But in terms of the day-to-day, some of the items that he did we've cited in our brief. He served as a primary representative prior to December of 2005. The contract was issued several years prior to that. He identified contractors that might be interested in doing earthwork for Ducks Unlimited, the prime contractor. He gave specifications and drawings to Ducks Unlimited as they came in and wanted to know the scope of their work. He obtained bids and forwarded them to Ducks Unlimited, again serving as a conduit for the functioning of the contract. And perhaps most important, in the eyes of Ducks Unlimited, through its representative, he served as the eyes and ears, the person who would be there for the government, to tell Ducks Unlimited when they needed to come and address an issue. Moreover, he was caught doing some of the work with his own heavy equipment. He was caught doing some of the work with his own heavy equipment. He wasn't just overseeing it. He was doing it. And, Your Honor, if I can follow up on that point, one thing that's vitally important is he knew he had a conflict and he knew that was wrong, as is evidenced by the fact that when a criminal investigation was undertaken, agents from the Department of Interior and the FBI came and interviewed him and he lied to them. Initially, he said, no, that wasn't my equipment. You'll recall, Your Honor, that the evidence here is that part of the work was done by using equipment that he owned jointly with his partner, Mr. Gort. And he also, yes, Your Honor. Okay, so can you respond to counsel's argument on the Section 208 violation? Absolutely. All of the items that I have just referenced to the court are affirmative acts that the defendant undertook as a representative of the government. I think what you have is you have two theories of criminal liability that intersect in the middle. The overarching theory is that he tried to fool the government by making the government think that someone other than he was performing the work. That's the mail fraud. That's the wire fraud. That's the scheme that he concocted with Mr. Gort in order to get money that he could not get through the front door by going in and saying, I'm a government employee. I want to benefit from this contract. Never mind all those conflict certifications that I signed. I want to get money. He couldn't do that. So he schemed to fool the government. That was the whole point. From the other side, it so happens that he also was undertaking acts on behalf of the government, which give rise to the 208 violation. He was acting as the primary government representative on site prior to December 2005. He did the acts that I referenced on behalf of half of the government. He identified contractors. He served as a conduit, giving specifications and drawings to the contractors. Perhaps most importantly, he drafted the specifications for Plan C, which appear as Government's Exhibit 16B as in Bravo, supplemental excerpt of Record 136. When the court reviews that, I think you'll probably be taken as I was with how brief they were. They were just like about five lines saying how deep the culvert would be and what the grading project would consist of. But the whole point is he was acting on behalf of the government, defining the scope of work that would be done on this project. Your Honor, you will recall, I believe, from the brief that this contract was also termed a partnership between the Fish and Wildlife Service and Ducks Unlimited, whereby they were to work cooperatively to decide on what work would be done, how it would be done, and the cost of the work over a period of time. I assume to give them flexibility to deal with the changing needs of the refuge in terms of a habitat for native wildlife. The drafting of the specifications saying what the pond is going to look like, how deep it's going to be dug, and what will be done there is a vital part of that. Mr. Pike, according to the evidence, viewed in the light most favorable to the government, drafted those specifications which appear at the supplemental excerpt of record as I indicated. Again, he knew he couldn't do this because when he was confronted, he lied initially and later when he told the truth he said, I did not admit using my equipment because I knew that would be a conflict. The whole point is to fool the government on the one side and on the other side he was carrying out acts on behalf of the government in the very contract in which he had hidden his own involvement. The wire fraud convictions involved money coming from the mainland by wire to Hawaii? Yes. No. No? It was from the mainland to Ducks Unlimited also on the mainland as I recall. The series of events is... That's what I'm trying to capture. The wire fraud is what? What was the wire fraud? The scheme for the wire fraud and mail fraud is the same. It's a scheme to deceive the government to fool them into thinking he wasn't involved using the straw contract. But where's the wire used? The mail comes first. Ducks Unlimited basically contracts with KFP, the straw contractor. KFP does the work. Mr. Pike prepares the invoices on behalf of KFP. Well, KFP doesn't do the work. Duarte does it claiming... Fair enough. Pretending to be KFP. I stand corrected. On paper, KFP appears to be doing the work which is part of the scheme to the fraud. The invoice prepared by Pike is submitted to Ducks Unlimited which then approves it and mails checks. Those are the mailings. Right. His argument is that that completes the fraud because the wrongdoer has now obtained all the money and it doesn't matter what happens after that point. Our argument is the subsequent wires are part of the scheme to the fraud because they consist of the government wire transferring money to Ducks Unlimited in payment on the prime contractor as they are obligated to do. And by the way, Your Honor, if I may just clarify what Mr. Wolf said. He said that the invoices that were false and fraudulent were not submitted to the government. That is true. But what he didn't mention to you is that the reason the government paid the invoices is because the claim for payment identified the vendor as KFP. And there is evidence in the record that had it been clear in any way, shape or form that a government employee had been the vendor, one, it wouldn't have been paid. Two, the contract probably would have been cancelled. And three, an inquiry would have been started. And in fact, we know that's not just hypothetically true. Everything you said is right. I'm still trying to get to the wire fraud part of it. He says, the other side says, well, okay, but how do you tag this guy out for wire fraud? Because he didn't know any reason to know there was going to be wire transfers. The wire transfers were far away in different places. Okay, I have two responses to that that will follow generally the argument that he has made. Number one, the issue on a wire fraud is not whether he had actual knowledge or should have known. It's reasonably foreseeable. It's whether it is reasonably foreseeable. And how is it reasonably foreseeable to him that there's going to be wire transfers between the federal government and DU? Well, I think we can use our common sense in assessing that. I think most federal employees get paid by wire transfer into their accounts. This gentleman worked on a remote refuge on the island of Kauai. Although we think we're the center of the world, I think we all recognize that there's a big island out there, the mainland. And he's dealing with a national contractor who is contracting with a department and agency of the United States Fish and Wildlife Service. I think the realities of modern-day commerce are that you can reasonably foresee that there would be electronic wire transfers. I mean, I'm sure he didn't know. Do you think the evidence supports that beyond a reasonable doubt? I think it does. On a sufficiency of the evidence reviewed, the court certainly can look at the evidence in the light most favorable to the government. The jury is entitled to draw reasonable inferences. The jury has before it a written document showing that you're dealing with big boys, the Fish and Wildlife Service, and you're dealing with Ducks Unlimited. You're dealing with a contract itself that contemplates wire transfers. You're dealing with an employee who's dealing with a contract over a period of, I think, four to five years before the wire transfers. And I think it's reasonably foreseeable. The jury was appropriately instructed on a reasonable foreseeability of wires. They haven't even claimed otherwise. They're challenging sufficiency on that point. They're not arguing misinstruction. With regard to the second argument that Mr. Wolf is making, he's saying, well, okay, even if it's reasonably foreseeable, then the issue is, is it in furtherance of the scheme? Because his client already got paid, he got the booty, and it doesn't matter to him anymore whether or not the government pays Ducks Unlimited. I would disagree, because I believe it's the low case out of the circuit, essentially says that it's not a strict temporal test. The scheme doesn't automatically end when the wrongdoer gets the money. The scheme ends as it is contemplated to end by the wrongdoer. And in this case, part of his scheme was to fool the government and keep fooling the government so he could get away with it. DU wasn't named as the victim. The federal government was named as the victim. That's absolutely right. The federal government was named as the victim. Our evidence, in our view, viewed in the light most favorable to the government, proves that the federal government was the victim. It's very similar to that case we cited, Bonalo, which involves the case where someone essentially used his computer expertise to withdraw money from his account at a bank using a debit card. Everybody knows the banks are going to reimburse the customers. Precisely. Precisely. I mean, you're dealing with a man, he may not be the highest decision level maker, but he's dealing with a contract knowing he's got a prime contractor and then he's got his straw subcontracting arrangement. He knows that the banks are going to reimburse him. Of course, the other science primary case is the Landward-Tennant case. And that is different if that's Millwood or Lee. But, I mean, what you had is you had the scheme directed at one and then the money coming from the other. And the jury instructions didn't jive, and the court said that was inappropriate. In other words, the intended victim has to be the person from whom the money is sought. Was DU paying any part of the money for this restoration project or was this all federal government money backing everything? All in a partnership. I mean, sometimes in a partnership, you know, we'll pay 10%, you'll pay 90%. Your Honor, I have to confess I don't know the specific answer to that. I think they meant partnership in the sense of jointly developing the nature of the work to be done as opposed to sharing an economic interest in it. Because I think Ducks Unlimited is a group who philosophically is involved in trying to preserve the habitat. And they wanted to have a say in it. Yeah, they like ducks so they can shoot them. This is recorded. I'm not going to respond to that, Your Honor. I'm not running for office. Nor am I. So as with yesterday, Your Honor, I've lost my train of thought. I find it so engaging. So I believe we've tried to address the points that are raised by Mr. Wolf. And as eloquent as he is, I think given the appropriate standard of review, I believe the evidence is sufficient to sustain the verdicts. I believe there's sufficient evidence on all counts that the scheme was proved, the victim was the United States, not just Ducks Unlimited, the mailings and the wire transfers were in furtherance and reasonably foreseeable, and that he committed affirmative acts justifying the conflict. And as to the conflict charge, of course, we're dealing with plain error review on the jury instructions. I don't see anything in his brief that suggests that he could have been convicted on any theory other than what was advanced. And we're looking out what the evidence is, and it's sufficient. Thank you. Thank you. Mr. Wolf? Yes, thanks. So on the 208 violation, here's the essential problem. The indictment accused Mr. Pike of doing something in August of 2005. This court's cases indicate when you say on or about, it may go a few days one way or the other. There's only one thing Pike did in 2005, in August, and that was prepare the KFP bid if you look at the evidence in the light most favorable to the government. Everything else that the government cites in their argument or in their brief, driving the bulldozer, doing this, doing that, none of that took place in August of 2005. So to sustain a conviction that he did something in August 2005 based on something he did in December 2005 or some other day in 2006 is just plain wrong. And that's why the evidence really isn't sufficient as to that count. But all the other stuff he looked at is 404 evidence, if you're right, eliminating what he did in 2005? Well, I suppose it could be. But the problem with the 208 violation, then, is that what Pike did in August 2005, he didn't do that as an employee of the Fish and Wildlife Service. That was outside the scope of his work. Well, that's like the old cases where sheriffs down south used to beat up African-Americans, and they claimed that because it's not part of my job to beat up African-Americans, therefore I'm not a sheriff and you can't use these civil rights laws against me. And the Supreme Court in Screws and other cases said, uh-uh. Yeah, well, I would choose a different analogy. I would say this. You have a government employee who goes back to his office, like I might, and checks his bank account balance or buys something on Amazon using a government computer and it takes two minutes. That's no part of the scope of that government employee's work. In no way is that employee doing government work. He's doing something else. And that's exactly what Pike was doing. If Pike uses his government computer to type up a bid, which is then submitted, there's no way that's part of his duties. Do you have any response to the wire fraud thing? I'm tantalized by the planetary distance between the wire transfers and what was going on. The question or the key is whether it was foreseeable to Pike that there would be a wire transfer. There's no evidence as to why that would be foreseeable to him. It might be foreseeable to some other reasonable person, like Mr. Hawks, the regional manager of Fish and Wildlife, or the Palmer, the Ducks Unlimited guy himself, or maybe even any of the people standing here talking about this case right now. If we look at his testimony, was he ever confronted with anything about the wire transfers? Mr. Pike, you're a federal government employee. Now, you knew, am I right, that wire transfers would be involved behind this. Was there anything like that when he was on the stand? I'm pretty confident the record is just silent on all that sort of inquiry. So there really is, your point is if we look carefully at the record, there will be no evidence on that, just inferences from the common knowledge of humankind from the air. Right, and the distinction I would say, maybe I'm saying it for the second time, is that the key is not that it's reasonably foreseeable to some reasonable person. It's got to be reasonably foreseeable to Mr. Pike himself. Thank you. Thank you very much. Thank you both for your arguments and your presentations here today. The case is now submitted.
judges: Goodwin, Trott, Murguia, Cjj